# United States Court of Appeals
### For the Eighth Circuit

_____

No. 24-1998
_____

United States of America

*Plaintiff - Appellee*

v.

LaVance LeMarr Cooper

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Northern District of Iowa - Eastern
_____

Submitted: January 17, 2025
Filed: February 5, 2025
_____

Before GRASZ, STRAS, and KOBES, Circuit Judges.
_____

STRAS, Circuit Judge.

In *United States v. Veasley*, we concluded that keeping firearms out of the hands of drug users does not "*always* violate[] the Second Amendment." 98 F.4th 906, 908 (8th Cir. 2024). Now the question is whether it *sometimes* can. The answer is yes, so we remand for the district court to determine whether it does for LaVance Cooper.

## I.

Cooper consented to a bench trial on stipulated facts. One was that he smoked marijuana three to four times a week. Another was that he had done it two days before officers found a Glock 20 pistol in his car during a traffic stop. Based on those facts and a few others, the district court found Cooper guilty of being a drug user in possession of a firearm, *see* 18 U.S.C. § 922(g)(3), and sentenced him to 37 months in prison.

Although *Veasley* recognized that as-applied challenges to the drug-user-in-possession statute are available, the district court disagreed. It was not open to dismissing the indictment even if, as Cooper argued, he posed no threat to anyone and had last smoked marijuana two days before the traffic stop. *See* Fed. R. Crim. P. 12(b)(1). In its view, once Congress decided that drug users as a "class" had no right to possess a gun, none could possess one, regardless of the who, what, when, where, and why of the drug use and gun possession. Even a frail and elderly grandmother who used marijuana for a chronic medical condition—the example we discussed in *Veasley*—could not be "in possession of a shotgun" to defend her home. *See Veasley*, 98 F.4th at 909, 917–18 (citing this example as a potentially meritorious as-applied challenge); *United States v. Daniels*, 124 F.4th 967, 977 (5th Cir. 2025) (same).

Cooper believes that *Veasley* requires a different answer. He continues to argue that prosecuting him under § 922(g)(3) violated the Second Amendment.[1] Our review is de novo. *See United States v. Turner*, 842 F.3d 602, 604 (8th Cir. 2016).

---

[1]Cooper also argues that the drug-user-in-possession statute is both facially unconstitutional and overly vague. Neither of those arguments, however, works. *See Veasley*, 98 F.4th at 918; *United States v. Deng*, 104 F.4th 1052, 1055 (8th Cir. 2024) (rejecting vagueness challenges by "frequent[] use[rs]" of marijuana); *see also Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) ("[O]ne panel is bound by the decision of a prior panel." (citation omitted)).

## II.

In every Second Amendment case, the overarching question is whether a limitation on the right to keep and bear arms is "consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). Key to answering that question is identifying "analogue[s]": Founding-era regulations that "impose[d] a comparable burden on the right of armed self-defense" with a "comparabl[e] justifi[cation]." *Id.* at 29–30 (emphasis omitted); *see also United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that the modern regulation "need not be a 'dead ringer' or a 'historical twin'" (quoting *Bruen*, 597 U.S. at 30)). If no comparable analogues exist because "disarmament is a [purely] modern solution to a centuries-old problem," *Veasley*, 98 F.4th at 912, or strays too far from the "how and why" of "historical regulations," *Bruen*, 597 U.S. at 29, then the Second Amendment kicks in. *See* U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.").

## A.

Fortunately, much of the background work on the drug-user-in-possession statute has already been done. In *Veasley*, we identified two Founding-era analogues that "make [it] constitutional in [certain] applications": "confinement of the mentally ill" and the "criminal prohibition on taking up arms to terrify the people." 98 F.4th at 912, 916.

Early in this country's history, the "mentally ill and dangerous" ended up in jails, makeshift asylums, and mental hospitals "with straitjackets and chains." *Id.* at 915. Confinement came with a "loss of liberties," including disarmament, "to preserve the peace of the community." *Id.* (quoting Alan Dershowitz, *The Origins of Preventive Confinement in Anglo-American Law Part II: The American Experience*, 43 U. Cin. L. Rev. 781, 787–88 (1974)). "Those who posed no danger,"

by contrast, "stayed at home with their families," with "their civil liberties . . . intact." *Id.* at 913.

The question is whether § 922(g)(3) is "relevantly similar" to this Founding-era analogue. *Bruen*, 597 U.S. at 29. It is, but not for everyone. The "behavioral effects" of mental illness and drug use can "overlap," *Veasley*, 98 F.4th at 912, but only the subset of the mentally ill who were dangerous faced confinement and the loss of arms. *See id.* at 913 ("Life was different . . . for those who were both mentally ill and dangerous."). It follows that, for disarmament of drug users and addicts to be comparably "justifi[ed]," it must be limited to those "who pose a danger to others." *Id.* at 915–16; *see also Rahimi*, 602 U.S. at 698 (reaching a similar conclusion about temporary disarmament of those subject to a domestic-violence restraining order). The analogy is complete, in other words, for someone whose "regular use[] of . . . PCP . . . induce[s] violence," but not for a "frail and elderly grandmother" who "uses marijuana for a chronic medical condition." *Veasley*, 98 F.4th at 909–10; *see also Rahimi*, 602 U.S. at 699–700 (recognizing that the same analogue can cut different ways in different cases). The latter would regulate "arms-bearing . . . to an extent beyond what was done at the [F]ounding." *Rahimi*, 602 U.S. at 692.

Much the same goes for *Veasley*'s other analogue, Terror of the People. *See* 98 F.4th at 916–17; *Rahimi*, 602 U.S. at 697–98. Initially a common-law crime and later codified in some states, these going-armed laws required more than "mere possession" of a weapon. *Veasley*, 98 F.4th at 917. As "a mechanism for punishing those who had menaced others with firearms," *Rahimi*, 602 U.S. at 697, an essential element was "terrorizing behavior . . . accompany[ing] the possession," *Veasley*, 98 F.4th at 917. *See, e.g.*, *State v. Huntly*, 25 N.C. 418, 423, 3 Ired. 311, 315 (1843) (explaining that the "essen[ce]" of the crime was "carry[ing] about . . . [a] weapon of death . . . in such a manner as naturally will terrify and alarm[] a peaceful people"). Punishment included imprisonment and "forfeiture of the arms" used in the crime. *Rahimi*, 602 U.S. at 697 (quoting 4 William Blackstone, Commentaries *149). Sometimes, when aggression was foreseeable, magistrates ordered

individuals to post surety bonds to "prevent[] violence before it occurred," but only after providing "significant procedural protections." *Id.* at 696–97.

The lesson to draw is that this analogy only works "for *some* drug users." *Veasley*, 98 F.4th at 917. When "a court has found that the defendant 'represents a credible threat,'" a ban on firearm possession "fits neatly within the tradition." *Rahimi*, 602 U.S. at 698–99 (quoting 18 U.S.C. § 922(g)(8)(C)(i)). And so does one applied to drug users who engage in "terrifying conduct." *Veasley*, 98 F.4th at 917 (listing examples of how "[c]ontrolled substances can induce terrifying conduct"). For others, like the hypothetical grandmother, threatening violence or causing terror is "exceedingly unlikely," so the justification for disarmament is not comparable. *Id.* at 917–18; *see Rahimi*, 602 U.S. at 699–700 (explaining that "our Nation's tradition of firearm regulation distinguishes" between those who pose a threat and those who do not); *see also id.* at 713 (Gorsuch, J., concurring) (highlighting that the Court "d[id] not decide . . . whether the government may disarm a person without a judicial finding that he poses a 'credible threat' to another's physical safety" (quoting 18 U.S.C. § 922(g)(8)(C)(i))).

These two analogues also frame the relevant questions for resolving Cooper's as-applied challenge. Did using marijuana make Cooper act like someone who is "both mentally ill and dangerous"? *Veasley*, 98 F.4th at 913. Did he "induce terror," *id.* at 918, or "pose a credible threat to the physical safety of others" with a firearm, *Rahimi*, 602 U.S. at 700? Unless one of the answers is yes—or the government identifies a new analogue we missed, *but cf. United States v. Connelly*, 117 F.4th 269, 274–75 (5th Cir. 2024) (coming up with a similar list)—prosecuting him under § 922(g)(3) would be "[in]consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

B.

Nothing in our tradition allows disarmament simply because Cooper belongs to a category of people, drug users, that Congress has categorically deemed dangerous. Neither the confinement of the mentally ill nor the going-armed laws operated on an *irrebuttable* basis.

In fact, each had an individualized assessment built in. Confinement of the mentally ill, for example, occurred at the "discretion" of "[j]ustices of the peace and other officials," but usually only after a finding that there would be some risk of "mischief" without it. *Veasley*, 98 F.4th at 914 (quoting Daniel Davis, *A Practical Treatise upon the Authority and Duty of Justices of the Peace in Criminal Prosecutions* 41 (Boston, Hilliard, Gray, Little, & Wilkins 2d ed. 1828)); *see Rahimi*, 602 U.S. at 699 (explaining that if imprisonment is permissible, then the lesser sanction of "temporary disarmament" is too). Similarly, going-armed laws applied based on a "judicial determination[] [that] a particular defendant . . . had threatened another with a weapon." *Rahimi*, 602 U.S. at 699; *see id.* (discussing a Massachusetts law that required "'reasonable cause to fear' . . . harm or breach [of] the peace" (quoting Mass. Rev. Stat., ch. 134, §§ 1, 16 (1836))). The aim, if it is not already clear, was to ensure that the risk supported the restrictions in each individual case. Without making room for similar individualized determinations, § 922(g)(3) does not "fit[] neatly within th[is] tradition," *id.* at 698, because it is not "comparably justified," *Bruen*, 597 U.S. at 29. *See Rahimi*, 602 U.S. at 698–99 (emphasizing that the judicial finding required by § 922(g)(8), which disarms certain domestic abusers, "matches the surety and going armed laws").

The only potential analogue that seemed to apply categorically was intoxication, but disarmament was not the remedy for it. *See Veasley*, 98 F.4th at 912. As *Veasley* discussed, intoxication has been prevalent throughout our nation's history, but "earlier generations addressed th[at] societal problem" by restricting when and how firearms could be used, not by taking them away. *Id.* at 911 (quoting

*Bruen*, 597 U.S. at 26). Only later, in the mid-20th century, did legislative attention turn to the potential danger posed by mixing guns and drugs. *See id.* at 912. These analogues make clear that "disarming *all* drug users," regardless of the individual danger they pose, is not comparable to anything from around the time of the Founding. *Id.*

We recognize that not every group targeted by a disarmament law is the same. Consider felons. In *United States v. Jackson*, a panel of this court surveyed a different set of Founding-era laws and concluded that they supported a categorical ban. *See* 110 F.4th 1120, 1125 (8th Cir. 2024) (holding that "there is no need for felony-by-felony litigation" under § 922(g)(1)); *cf. Connelly*, 117 F.4th at 278 (suggesting that there might be a tradition of disarming groups comparable to "political traitors" and "potential insurrectionists"). *But see United States v. Jackson*, 121 F.4th 656, 656–57 (8th Cir. 2024) (Stras, J., dissenting from denial of reh'g en banc) (disagreeing). Supreme Court dicta singling out felon-dispossession laws as "presumptively" constitutional provided additional support. *Jackson*, 110 F.4th at 1125, 1128–29; *see Rahimi*, 602 U.S. at 698 (leaving open the possibility that some "laws banning the possession of guns by categories of persons" might be constitutional).

We have "no such 'assurances,'" however, about drug users and addicts. *Veasley*, 98 F.4th at 909 n.2 (quoting *United States v. Jackson*, 69 F.4th 495, 501–02 (8th Cir. 2023), *vacated*, 144 S. Ct. 2710 (2024)). Nor has our review of the historical tradition surrounding them, to the extent one exists, turned up any bright-line rules.[2] Sometimes disarming drug users and addicts will line up with the case-

---

[2]*United States v. Seay*, 620 F.3d 919 (8th Cir. 2010), is of little help here because it addressed a facial Second Amendment challenge before *Bruen* and *Rahimi* made clear that the analysis consisted of "historical work and 'analogical reasoning.'" *Veasley*, 98 F.4th at 918 (quoting *Bruen*, 597 U.S. at 29–30). It did not deal with an as-applied challenge, *see Seay*, 620 F.3d at 922, much less say anything that would help us decide this one.

by-case historical tradition, but other times it will not. *See id.* at 918. The district court's task on remand is to figure out which side of the Second Amendment line Cooper's case falls on.

C.

The district court, for its part, agreed with our analogy to the going-armed laws, but dismissed much of the rest of what we said as dicta. It took issue with our discussion of how § 922(g)(3) might be constitutional in some applications but not in others. *See id.* at 916–18; *cf. Rahimi*, 602 U.S. at 693 (analyzing a facial challenge using "the facts of Rahimi's own case"). Unsurprisingly, the government has backed away from this line of reasoning, which misunderstands how facial and as-applied challenges work. *See Veasley*, 98 F.4th at 909–10 (explaining the difference).

The reason is simple: the "outer bounds" of the Second Amendment are *always* "delimit[ed]" by "historical tradition." *Bruen*, 597 U.S. at 19. From that foundational principle, "the appropriate analysis" necessarily "involves considering whether the challenged regulation . . . is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). The only thing that changes is the height of the hurdle facing the challenger. *See Veasley*, 98 F.4th at 909 (explaining that the "bar goes up" in a facial challenge). The underlying textual and historical analysis remain the same. *See id.* at 910 (explaining that "the same text-and-historical-understanding framework" applies either way); *Rahimi*, 602 U.S. at 690 (rejecting a facial challenge because, "[a]s applied to the facts of th[at] case, Section 922(g)(8) fits comfortably within th[e] [historical] tradition"); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 330–31 (2010).

Look at it this way. *See Bruen*, 597 U.S. at 28–30 (explaining how to do "analogical reasoning under the Second Amendment"). It is true that a facial challenge requires a showing that there is "no set of circumstances . . . under which

-8-

[§ 922(g)(3)] would be valid," while all that matters for Cooper's as-applied challenge is how the statute affected *him*. *Veasley*, 98 F.4th at 909. Either way, however, the question we ask is the same: is "the regulation . . . consistent with this Nation's historical tradition of firearm regulation"? *Bruen*, 597 U.S. at 17; *see also Jackson*, 110 F.4th at 1125–29 (relying on the same history to resolve both types of challenges). And in both instances, the analogies we identified in *Veasley* will provide the answer. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").

D.

Although both sides invite us to resolve Cooper's as-applied challenge, the district court is in the best position to take the first crack at it. The factual record is thin, given that the case proceeded to a bench trial on stipulated facts, so the parties may want to supplement the record with other evidence. In the meantime, we will tie up a loose end to save everyone time on remand.

The government suggests in its briefing that Cooper is too dangerous to have a gun because he "possessed [one] for *protection* after [a] recent shooting at his residence." (Emphasis added). We disagree for two reasons. First, the parties only stipulated that "officers were dispatched to [his] residence . . . in reference to *an individual who had been shot*," not a shooting that happened there. (Emphasis added). And second, "individual self-defense is 'the *central component*' of the Second Amendment right," not an exception to it.[3] *McDonald v. City of Chicago*,

---

[3]Marijuana use by itself is not an exception either, even if *possessing* it breaks federal law. 21 U.S.C. §§ 802(6), 812(c) sched. I(c)(10), 844(a); *see Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("[A] claim that a group is 'irresponsible' or 'dangerous' does not remove them from the definition of the people."); *see also Rahimi*, 602 U.S. at 701 ("reject[ing] the Government's

561 U.S. 742, 767 (2010) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)); *see Heller*, 554 U.S. at 628 (emphasizing that "the home [is] where the need for defense of self, family, and property is most acute").

## III.

We accordingly vacate the district court's judgment and remand for a reexamination of Cooper's motion to dismiss the indictment.

———————————————————

contention that Rahimi may be disarmed simply because he is not 'responsible'"). As the analogues show, it takes something more. *See Veasley*, 98 F.4th at 911–12 (describing how "[c]annabis was in use" before the Founding, but there is no evidence that use alone led to disarmament).